1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10

11  JULIAN ANDREW HAMILTON,              Case No. CV 13-08528 SS

12                 Plaintiff,

13       v.

14  CAROLYN W. COLVIN, Acting           **MEMORANDUM DECISION AND ORDER**
    Commissioner of Social
15  Security,
                   Defendant.
16

17

18

19                           **I.**

20                      **INTRODUCTION**

21

22       Julian Andrew Hamilton ("Plaintiff") brings this action

23  seeking to reverse the decision of the Commissioner of the Social

24  Security Administration (hereinafter the "Commissioner" or the

25  "Agency") denying his application for Disability Insurance

26  Benefits and Supplemental Security Income Benefits.  The parties

27  consented, pursuant to 28 U.S.C. § 636(c), to the jurisdiction of

28  the undersigned United States Magistrate Judge.  For the reasons

stated below, the decision of the Commissioner is REVERSED and the action is REMANDED for further review consistent with this decision.

## II.

### PROCEDURAL HISTORY

On August 5, 2010, Plaintiff filed protective applications with the Social Security Administration ("the Agency") for a period of disability and Disability Insurance Benefits as well as for Supplemental Security Income. (See Administrative Record ("AR") 175-85). He alleged a disability onset date of April 4, 2009. (AR 175, 179). Plaintiff based his claims on back injury, lung and heart problems, hypertension, hand tremors, memory problems, chronic nervousness, thyroid condition and depression. (See AR 75-81; see also AR 224-34). On January 26, 2011, the Agency denied both claims. (AR 105-109).

On March 28, 2011, Plaintiff timely requested a hearing. (AR 112-13). Hearings were held before Administrative Law Judge ("ALJ") Lawrence D. Wheeler on November 15, 2011, and May 30, 2012. (AR 59-88; AR 29-58, respectively). Plaintiff appeared at both proceedings and was represented by counsel. (AR 29, 59). Vocational experts Ronald Hatakeyama and Elizabeth Brown-Ramos testified at the hearings. (See AR 29, 31, 44-45; AR 59, 61-62, respectively).

\\

On August 8, 2012, the ALJ issued a decision denying benefits. (AR 11-28). Plaintiff sought review of the ALJ's decision before the Appeals Council. (AR 10, 256-60). The Council denied the request on September 18, 2013. (AR 1-6). Plaintiff sought review by this Court on November 13, 2013. (Dkt. Item Nos. 3, 17).

### III.
### FACTUAL BACKGROUND

Plaintiff was born in Iran on September 22, 1948 and later moved to the United States. (AR 63, 261, 376). He was sixty years old on the date that he allegedly became disabled and sixty-three at the time of his most recent hearing before the ALJ. Plaintiff graduated from college with a B.S. degree in Math and received an MBA in 1977 from a university in Oklahoma. (AR 45-46, 69-70). His relevant work history consisted of being a self-employed appraiser and adjuster for an auto body shop. (AR 67). Plaintiff became a naturalized citizen in 1997 (AR 6), and has lived in the United States for forty years. (AR 63).

### IV.
### FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents him from engaging in substantial gainful

activity[1] and that is expected to result in death or to last for a continuous period of at least twelve months.  Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)).  The impairment must render the claimant incapable of performing the work he previously performed and incapable of performing any other substantial gainful employment that exists in the national economy.  Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry.  20 C.F.R. § 416.920.  The steps are:

(1) Is the claimant presently engaged in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.

(2) Is the claimant's impairment severe?  If not, the claimant is found not disabled.  If so, proceed to step three.

(3) Does the claimant's impairment meet or equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1?  If so, the claimant is found disabled.  If not, proceed to step four.

_____

[1]   Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit.  20 C.F.R. § 416.910.

4

     (4) Is the claimant capable of performing his past

         work? If so, the claimant is found not disabled.

         If not, proceed to step five.

     (5) Is the claimant able to do any other work? If

         not, the claimant is found disabled. If so, the

         claimant is found not disabled.


Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari, 262 F.3d 949, 953-54 (9th Cir. 2001); 20 C.F.R. § 416.920(b)-(g)(1).


    The claimant has the burden of proof at steps one through four, and the Commissioner has the burden of proof at step five. Bustamante, 262 F.3d at 953-54. If, at step four, the claimant meets his burden of establishing an inability to perform the past work, the Commissioner must show that the claimant can perform some other work that exists in "significant numbers" in the national economy, taking into account the claimant's RFC, age, education and work experience. Tackett, 180 F.3d at 1100; 20 C.F.R. § 416.920(g)(1). The Commissioner may do so by the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly known as "the Grids"). Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001). When a claimant has both exertional (strength-related) and nonexertional limitations, the Grids are inapplicable and the ALJ must take the testimony of a

vocational expert.  Moore v. Apfel, 216 F.3d 864, 869 (9th Cir. 2000).

## V.

### THE ALJ'S DECISION

Pursuant to the five-step inquiry, the ALJ found that Plaintiff had not engaged in substantial gainful activity since April 4, 2009, the onset date of his disability (step one); that Plaintiff's severe impairments consisted of atrial fibrillation, hyperthyroidism, chronic obstructive pulmonary disease, degenerative disc disease of the lumbar spine and hypertension (step two); that Plaintiff's impairments did not meet or medically equal the severity of one the listed impairments pursuant to 20 CFR Part 404, Subpart P, Appendix 1 (step three), and that Plaintiff had the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) with some exceptions (step four).  (AR 16-23).

Although the ALJ found Plaintiff's medically determinable impairments could reasonably be expected to cause his alleged symptoms, the ALJ determined that Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms were not credible to the extent that they were inconsistent with the residual functional capacity assessment. (AR 21-22).  The ALJ identified several reasons in support of his finding that Plaintiff's testimony regarding his pain and symptoms was not credible and also assigned different weights to

the opinion evidence that had been presented.  (AR 21-23).
Ultimately, the ALJ determined that Plaintiff was capable of
performing his past relevant work as an appraiser.  (AR 23).

## VI.

### STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the
Commissioner's decision to deny benefits.  The court may set
aside the Commissioner's decision when the ALJ's findings are
based on legal error or are not supported by substantial evidence
in the record as a whole.  Aukland v. Massanari, 257 F.3d 1033,
1035 (9th Cir. 2001); Smolen v. Chater, 80 F.3d 1273, 1279 (9th
Cir. 1996).

"Substantial evidence is more than a scintilla, but less
than a preponderance."  Reddick, 157 F.3d at 720.   It is
"relevant evidence which a reasonable person might accept as
adequate to support a conclusion."  Id.  To determine whether
substantial evidence supports a finding, the court must
"'consider the record as a whole, weighing both evidence that
supports and evidence that detracts from the [Commissioner's]
conclusion.'"  Aukland, 257 F.3d at 1035 (quoting Penny v.
Sullivan, 2 F.3d 953, 956 (9th Cir. 1993)).  If the evidence can
reasonably support either affirming or reversing that conclusion,
the court may not substitute its judgment for that of the
Commissioner.  Reddick, 157 F.3d at 720-21.

**VII.**

**DISCUSSION**

Plaintiff contends that the ALJ's decision was improper because the ALJ made the following alleged errors when conducting his review of the case:  (1) he failed to provide Plaintiff with a full and fair hearing, (2) he failed to give appropriate weight to the treating physicians, (3) he erred in determining Plaintiff's credibility, and (4) he erred in determining Plaintiff's residual functional capacity and his ability to perform past relevant work.  (Memorandum in Support of Plaintiff's Complaint ("Complaint") at 4-13).  For the reasons discussed below, the Court finds the ALJ's decision must be reversed and remanded.

A.   The ALJ Erred By Rejecting Opinion Evidence Favorable To Plaintiff Without Providing Specific and Legitimate Reasons Supported By Substantial Evidence In The Record

Plaintiff argues that the ALJ erred by failing to give appropriate weight to the treating physicians' opinions.  (Complaint at 6-8).  The Court agrees.

\\

\\

8

1

2

        1.   <u>Dr. Ram's Evaluation Of Plaintiff</u>

3

4

     Plaintiff alleged an onset date of disability of April 4,
2009.  (AR 175, 179).  In August 2010, the record indicates that

5

Dr. Asher Ram became Plaintiff's treating physician.  (<u>See</u> AR

6

263).  At the time, Plaintiff reported having a heart condition,

7

lung problems, and radiating lower back pain.  (Id.).  Dr. Ram

8

also noted that Plaintiff was an "ex heavy smoker." (Id.).  Over

9

the course of several months, Dr. Ram gave Plaintiff a physical,

10

ordered a series of tests and lab work, and prescribed various

11

medications to treat Plaintiff's illnesses.  (<u>See</u> AR 264-76).

12

One of the tests administered by Dr. Ram appears to confirm

13

Plaintiff's atrial fibrillation condition.  (<u>See</u> AR 270, 275-76).

14

15

     Over a year later, in November 2011, Dr. Ram filled out

16

Plaintiff's Cardiac Residual Functional Capacity Questionnaire

17

("Cardiac RFC").  (AR 352-56).  In it, Dr. Ram indicated that

18

Plaintiff had been diagnosed with atrial fibrillation,

19

hypertension, chronic obstructive pulmonary disease ("COPD"), and

20

sciatic neuropathy.  (AR 352).  He further noted that Plaintiff's

21

clinical manifestations of these illnesses included high blood

22

pressure, irregular heartbeat, diminished respiratory and heart

23

sounds, and that his symptoms included shortness of breath,

24

fatigue, weakness, palpitations, dizziness and radiating lower

25

back pain.  (AR 352).

26

\\

27

\\

28

Based on Dr. Ram's observations of Plaintiff over time, he ultimately determined that Plaintiff was "incapable of even 'low stress' jobs," due to his cardiac, lung and back problems, that Plaintiff's "chronic disabling condition" contributed to his depression, and that Plaintiff's cardiac symptoms would frequently interfere with his ability to perform even simple work tasks. (AR 353-56). Heavy lifting, bending, and exposure to environmental extremes were prohibited. (Id.). Almost forty pages of medical records and notes kept by Dr. Ram over the course of several months were submitted to the ALJ in support of Plaintiff's application. (AR 261-76, 351-71) (Dr. Ram's records from August 2010 to November 2011).

Despite these facts, the ALJ gave "little weight" to Dr. Ram's opinion, because "Dr. Ram [was] a general practitioner, and the record contain[ed] insufficient evidence that he ha[d] expertise in cardiac medicine." (AR 23). Additionally, the ALJ opined, the extreme limitations Dr. Ram had recommended were not supported by his treatment notes or by Plaintiff's activities. (AR 23).

2.   Dr. Wallack's Evaluation Of Plaintiff

On November 30, 2010, Canyon Medical Group's Dr. Michael S. Wallack, an internist, conducted a one-day Complete Internal Medicine Evaluation of Plaintiff. (See AR 277-86). Dr. Wallack's physical examination indicated that Plaintiff had "an

10

irregularly irregular [heart] rhythm," and "tenderness to palpitation in the lumbar area." (AR 281). Limited forward flexion and extension in Plaintiff's back was noted. (Id.). The evaluation also indicated that Plaintiff could grip up to fifteen pounds in his left hand and up to twenty pounds in his right hand (AR 280), and that Plaintiff had a "resting tremor." (AR 282). Dr. Wallack noted that Plaintiff was taking Coumadin, Lopressor and Doxazosin to manage his illnesses. (AR 279).

Ultimately, Dr. Wallack concluded that Plaintiff should be able to occasionally lift 50 pounds and frequently lift 25 pounds. (AR 283). Dr. Wallack also indicated that Plaintiff should be able to stand and walk from six to eight hours. (AR 283). Bilateral fingering was limited to "frequent," and Dr. Wallack determined that Plaintiff had no environmental limitations. (AR 283).

The ALJ assigned "moderate" weight to Dr. Wallack's opinion, noting that it was "consistent with the record as a whole." (AR 22).

        3.   Dr. Ahmed's Evaluation Of Plaintiff

On January 18, 2011, Dr. A. Ahmed, a state agency physician (see AR 22), performed a one-day Physical Residual Functional Capacity Assessment ("Physical RFC") of Plaintiff. (See AR 292-99). Prior to his evaluation of Plaintiff, Dr. Ahmed received a

report from Dr. Ram on November 19, 2010, and a report from Canyon Medical Group on December 13, 2010. (AR 297). Ultimately, Dr. Ahmed acknowledged Plaintiff's atrial fibrillation, chronic lower back strain and idiopathic finger tremors. (AR 292, 298). He also noted that Plaintiff suffered from hypertension that was "poorly controlled." (AR 298).

Dr. Ahmed concluded that Plaintiff should be able to occasionally lift 50 pounds, frequently lift 25 pounds, and stand, walk and sit about six hours in an eight-hour workday. (AR 293). Dr. Ahmed also indicated that Plaintiff should be able to climb, balance, stoop and perform most other postural activities frequently. (AR 294). Bilateral fingering was limited to "frequent," and Dr. Ahmed determined that Plaintiff had no environmental limitations. (AR 294-95). Dr. Ahmed's evaluation was a check-off report. He did not supplement the report with any explanation of how or why he came to his conclusions. (See generally, AR 292-96).

The ALJ assigned "great weight" to Dr. Ahmed's opinion, finding it was "consistent with the record as a whole." (AR 22).

4. Analysis

The opinions of treating physicians are entitled to special weight because the treating physician is hired to cure and has a better opportunity to know and observe the claimant as an

individual.  Connett v. Barnhart, 340 F.3d 871, 874 (9th Cir. 2003).  An ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole, or unsupported by objective medical findings.  Batson v. Comm'r of Soc. Sec., 359 F.3d 1190, 1195 (9th Cir. 2004).  An ALJ, however, may not reject the opinion of a treating physician, even if it is contradicted by the opinions of other doctors, without providing "specific and legitimate reasons" supported by substantial evidence in the record.  Reddick, 157 F.3d at 725.

Less weight is given to the opinion of a non-examining source than to an examining source.  See Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1996).  "The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician."  Id. at 831.

The ALJ improperly rejected Dr. Ram's opinion.  First, Dr. Ram was Plaintiff's treating physician and as such, his opinion was entitled to greater weight.  Connett, 340 F.3d at 874. Second, Dr. Ram's assessments of Plaintiff were largely supported by the record.  Drs. Wallack and Ahmed noted in their records, similar to Dr. Ram, that Plaintiff suffered from significant heart, lower back, and hand tremor problems amongst other ailments.  (See AR 278-82; see also AR 292).  Third, unlike the impairment assessments of Drs. Wallack and Ahmed, Dr. Ram's assessment of Plaintiff's ability to lift objects, walk and stand

is more recent in time and was directly assessed by Dr. Ram over the year-long period that Plaintiff was under his care. A treating physician's recent medical report is generally the most probative. Stone v. Heckler, 761 F.2d 530, 532 (9th Cir. 1985). In sum, the ALJ's reasons for rejecting Dr. Ram's findings were not supported by substantial evidence.

The ALJ also improperly afforded more weight to Dr. Ahmed's evaluation given its content and given the conflict between Ahemnd's findings and the substantive, more comprehensive information in the record. Dr. Ahmed's Physical RFC report, dated January 18, 2011, was a one-time, five-page, check-off evaluation. (AR 292-96). It relied upon Dr. Ram's and Dr. Wallack's records which Dr. Ahmed's office received on November 19, 2010 and December 13, 2010, respectively. (See AR 297-99). At that time, Plaintiff had been in Dr. Ram's care for approximately three months, and records in existence from the Canyon Medical Group that Dr. Ahmed reviewed consisted of Dr. Wallack's Complete Internal Medicine Evaluation of Plaintiff and Dr. Bernard Monderer's ophthalmological examination. (See generally AR 297; AR 277-86; AR 287-91). In addition, as Plaintiff points out, Dr. Wallack's one-day internal examination appears to provide conflicting information in that it states that Plaintiff has a grip strength of fifteen to twenty pounds but that he should be able to lift and carry twenty-five to fifty pounds. (AR 280, 283).

14

It has been held that check-off reports like Dr. Ahmed's are not entitled to great deference. See Crane v. Shalala, 76 F.3d 251, 253 (9th Cir. 1996) (ALJ properly rejected doctor's opinion because doctor prepared check-off reports that did not contain any explanation for conclusions).   Additionally, as a non-treating physician, Dr. Ahmed's opinion should be afforded less weight.  Lester, 81 F.3d at 830-31.   Moreover, given that Dr. Ahmed relied on an incomplete record from Dr. Ram and a conflicting record from Dr. Wallack in order to complete the check-off report, the ALJ's assignment of "great weight" to Dr. Ahmed's evaluation because it "was consistent with the record as a whole" (AR 22) is not supported by substantial evidence in the record.

The ALJ failed to provide specific and legitimate reasons supported by substantial evidence in the record for rejecting treating physician opinion evidence favorable to the Plaintiff. Therefore, the ALJ's decision should be reversed and this action remanded.

B.   The ALJ Erred By Rejecting Plaintiff's Testimony Without
     Providing Clear and Convincing Reasons

Plaintiff argues that the ALJ's finding that Plaintiff was not credible should not be permitted to stand because his reasons were not based on substantial evidence.   (Complaint at 8-11). The Court agrees.

15

Whenever an ALJ's disbelief of a claimant's testimony is a critical factor in a decision to deny benefits, as it is here, the ALJ must make explicit credibility findings. <u>Rashad v. Sullivan</u>, 903 F.2d 1229, 1231 (9th Cir. 1990); <u>see</u> <u>Albalos v. Sullivan</u>, 907 F.2d 871, 874 (9th Cir. 1990) (implicit finding that claimant was not credible is insufficient). Unless there is affirmative evidence showing that the claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing." <u>Lester</u>, 81 F.3d at 834. As long as the plaintiff offers evidence of a medical impairment that could reasonably be expected to produce pain, the ALJ may not require the degree of pain to be corroborated by objective medical evidence. <u>Bunnell v. Sullivan</u>, 947 F.2d 341, 346-47 (9th Cir. 1991) (en banc); <u>Smolen</u>, 80 F.3d at 1282.

The ALJ can, however, reject the plaintiff's testimony regarding the severity of her symptoms if he points to clear and convincing reasons for doing so. See <u>Smolen</u>, 80 F.3d at 1283-84. To determine whether a plaintiff's testimony regarding the severity of his symptoms is credible, the ALJ may consider, among other things, the following evidence: (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities. <u>Id</u>. at 1284.

16

The ALJ determined that Plaintiff's hyperthyroidism, chronic obstructive pulmonary disease, low back pain and hypertension were impairments that "cause[d] significant limitation in [Plaintiff's] ability to perform basic work activities," and that they "could reasonably be expected to cause [Plaintiff's] alleged symptoms." (AR 17, 21). The ALJ also found that Plaintiff had the residual functional capacity to perform medium work, with some limitations. (AR 20). The ALJ further concluded that Plaintiff's statements regarding the intensity, persistence and limiting effects of his symptoms were "not credible to the extent that they [were] inconsistent with the [] residual functional capacity assessment." (AR 21.)

1.   <u>Plaintiff's Hand Tremors Are Documented In The Record</u>

There are several instances throughout the ALJ's decision where his rejection of Plaintiff's testimony is not supported by clear and convincing evidence. For example, regarding Plaintiff's hand tremors, the ALJ states:

The [Plaintiff] testified to having tremors in his hands and alleged that his tremors have worsened. However, the treatment record contains little evidence of the [Plaintiff] complaining about tremors, and one of his physicians recently hypothesized his hyperthyroid state might be causing his alleged tremors, yet the doctor could not rule out other

17

1
2      causes.        At    the    November    2010    consultative
3      examination,   the   examining   physician   noted   a   fine
4      tremor  of  the  claimant's  outstretched  hands  at  rest,
5      but  the  tremors  decreased  with  movement.

6  (AR 21) (internal citations omitted).
7

8      The   record   indicates   several   instances   where   Plaintiff
9  mentions   his   tremors   to   treating   health   professionals   and
10 they   are   documented.     In   November   2010,   Dr.   Wallack   noted
11 Plaintiff's   'fine   tremor'   and   'resting   tremor'   in   his
12 evaluation   of   Plaintiff.    (AR   280,   282).    In   January   2011,
13 when   Dr.   A.   Ahmed   performed   Plaintiff's   Physical   RFC,   in   it
14 he   noted   that   Plaintiff   had   "fine   idiopathic   tremor   of   the
15 fingers."   (AR   292).   In   November   2011,   when   Plaintiff   saw
16 his   treating   psychologist,   Dr.   Joshua   Williams,   he   self-
17 reported   that   he   was   experiencing   "sweating,   shaking,   []
18 trembling."  (AR 438).   At   Plaintiff's   November   2011   hearing,
19 he   repeatedly   testified   to   the   ALJ   that   his   hand   "shakes   a
20 lot."   (AR   67;   see   AR   81,   83).   In   June   2012,   Dr.   Albert
21 Askarinam,   who   was   treating   Plaintiff   for   his   thyroid
22 condition,   remarked   in   his   physician   notes   that   Plaintiff
23 has   hand   tremors.    (AR   406).    Thereafter,   in   a   note   dated
24 July   2012,   Dr.   Askarinam   also   indicated   that   Plaintiff   had
25 tremors.    (AR   419).    At   Plaintiff's   May   2012   hearing,   he
26 indicated   to   the   ALJ   that   samples   of   his   thyroid   might   have
27 to   be   taken   soon   because   his   medication   had   not   been
28

working, and his hand "[was] shaking a lot." (AR 35). He subsequently testified that he was unable to work on a keyboard because of the tremor (AR 46), and he showed the tremor to the ALJ in open court. (AR 48-49). In sum, the record clearly indicates that Plaintiff suffers from tremors. Thus, the ALJ failed to provide clear and convincing reasons for rejecting Plaintiff's testimony with respect to his tremors.

> 2.   <u>Plaintiff's Headaches, Night Sweats and Shoulder Pain Are Documented In The Record</u>

Regarding Plaintiff's reporting of headaches, night sweats, shoulder pain, and leg pain, the ALJ writes:

> Although the claimant testified to having headaches, night sweats, shoulder pain, and leg pain, the treatment record contains little or no evidence of him complaining to his medical care providers about any of these symptoms. At his field office interview, the interviewer noted the claimant was very animated in complaining about how sick he was, yet he showed no obvious signs of his alleged disability.

(AR 21) (internal citations omitted).

Again, the record indicates that Plaintiff regularly reported these ailments to attending health care professionals. In April 2009, after Plaintiff had been hit by a car, Dr. Alireza Mirshojae, Plaintiff's treating chiropractor, evaluated Plaintiff and his injuries. (See AR 304, 342-49). He reported that Plaintiff complained of headaches, shooting pain into his right upper body, lower back pain, pain in his right shoulder and hip. (AR 343; see AR 344-46). In August 2010, Dr. Ram, Plaintiff's treating physician, noted that Plaintiff self-reported suffering from "low-back pain radiating to right thigh, numbness right foot." (AR 263; see generally, 264-67). In November 2010, internist Dr. Michael Wallack noted that Plaintiff suffered from back and shoulder pain. (AR 278-79, 282). In November 2011, a year later, during Plaintiff's Cardiac RFC evaluation, Dr. Ram again reported that Plaintiff suffered from "low back pain radiating to [right] lower ext[remity]". (AR 352). That same month, Plaintiff reported to psychologist Dr. Joshua Williams that he "walk[ed] with a limp and ha[d] hip pain which prevent[ed] him from working." (AR 422). Plaintiff also told Dr. Williams that he suffered from "sweating, shaking, [] trembling." (AR 438). Finally, Plaintiff testified at his November 2011 hearing with the ALJ that he had "pain in [his] right shoulder, [his] back, [his] legs." (AR 78). In the ALJ's August 2012 decision, he acknowledged that Plaintiff "complained of low back pain, with radiation to the right thigh," and subsequently found that this impairment caused "significant limitation in [Plaintiff's] ability to perform basic work

activities." (AR 17). The record clearly indicates that Plaintiff has suffered from headaches, night sweats, shoulder pain, and leg pain. Thus, the ALJ failed to provide clear and convincing reasons for rejecting Plaintiff's testimony regarding these conditions.

3. **Plaintiff's Smoking History Is Consistently Established In The Record**

The ALJ found that Plaintiff's stated history of smoking "cast serious doubt on [Plaintiff's] credibility." (AR 21). The ALJ opined:

> The record contains several other contradictions that cast serious doubt on [Plaintiff's] credibility. . . . He reported at the consultative examination in November 2010 that he does not smoke. He testified he quit smoking about a year prior to the hearing, but the undersigned noted to [Plaintiff] that a treatment note from April 2012 indicated [Plaintiff] reported smoking half a pack of cigarettes a day.

> [I] found the record so replete with contradictions that [Plaintiff's] reports regarding his limitations cannot be considered fully credible.

(AR 21-22) (internal citations omitted).

A review of the record indicates that in August 2010, Dr. Ram noted in an initial interview of Plaintiff that Plaintiff was an "ex heavy smoker," but that he did not smoke anymore. (AR 263; see AR 265). In November 2010, Plaintiff reported to Dr. Wallack that he did not smoke. (AR 279). At Plaintiff's hearing in November 2011, he told the ALJ that he did not smoke anymore. (AR 72). Six months later, in April 2012, Dr. Askinaram noted the following about Plaintiff: "Doing better, [a]lthough still smokes 1/2 PPD . . . ." (AR 386). A month later, at Plaintiff's May 2012 hearing, Plaintiff testified that he did not smoke and had stopped smoking approximately a year earlier. (AR 37). When the ALJ noted this discrepancy and asked Plaintiff about it, Plaintiff denied having made that statement to Dr. Askinaram and said, "I don't know how they got the idea that I smoke half a pack of cigarettes a day. . . . I would tell you that if I was a smoker. . . . I think the doctor has it wrong. I don't know what to say. He's not here. I wish he was." (AR 43-44).

There is no indication in the medical record that Plaintiff had a reputation for malingering. On the contrary, in November 2010, internist Dr. Michael Wallack, whose opinion the ALJ assigned "moderate weight" (AR 22), noted in Plaintiff's Complete Internal Medicine Evaluation that Plaintiff "was a fair historian." (AR 278). In Plaintiff's November 2011 Cardiac RFC, treating physician Dr. Ram who had worked with Plaintiff over the course of more than one year specifically noted that Plaintiff was not a malingerer. (AR 352). Additionally, in January 2012

when Dr. Lou Ellen Sherrill conducted a psychological evaluation of Plaintiff, although she opined at one point that Plaintiff "did not appear to be putting forth his best effort" on the Test of Memory Malingering (AR 378), she found that "most of [Plaintiff's] test performances indicated that he appeared to be cooperating with the evaluation," and that Plaintiff "appeared generally cooperative throughout the evaluation." (AR 375). The ALJ had assigned "great weight" to Dr. Sherrill's opinion. (AR 23). Moreover, given that Dr. Askinaram's notes are abbreviated, it is possible that the ALJ's interpretation of them is not accurate.

The record indicates that Plaintiff's testimony regarding his smoking habits was consistent with his reports to physicians, with a single exception. The ALJ has failed to provide clear and convincing reasons to discredit Plaintiff's testimony regarding this issue.

In light of the above, the ALJ's determination that "the record contains little or no evidence of [Plaintiff] complaining to his medical care providers about any of [the above-referenced] symptoms" (AR 21) is not substantiated. Thus, the ALJ has failed to provide clear and convincing reasons for discounting Plaintiff's credibility and rejecting his testimony. Consequently, the ALJ's decision should be reversed and this action remanded.

C.   <u>The ALJ's Comments During The Hearing Also Warrant A Remand</u>
     <u>Of This Case To A Different ALJ For Review</u>

     Plaintiff argues that the ALJ failed to provide Plaintiff
with a full and fair hearing because throughout the proceedings
the ALJ appeared to be biased.   (Complaint at 4-6).   The Court
finds that the ALJ made comments on the record that raise
concerns.

     "[D]ue process requires that any hearing afforded [a Social
Security disability] claimant be full and fair." <u>Ventura v.</u>
<u>Shalala</u>, 55 F.3d 900, 902 (3rd Cir. 1995).   This standard is
violated when an ALJ exhibits bias or animus against a claimant.
<u>Id.</u>   In order to find a violation of due process based on bias,
it must be shown that "the ALJ's behavior, in the context of the
whole case, was so 'extreme as to display clear inability to
render fair judgment.'"   <u>Bayliss v. Barnhart</u>, 427 F.3d 1211,
1214-15 (9th Cir. 2005) (citing <u>Rollins v. Massanari</u>, 261 F.3d
853, 858 (9th Cir. 2001) and <u>Liteky v. United States</u>, 510 U.S.
540, 551 (1994)).

     A review of the transcript shows that the ALJ may have held
a particular view of Plaintiff's ethnic heritage and country of
origin, Iran, that could have impacted the ALJ's decisionmaking.
During both hearings, a number of statements and questions raised
by the ALJ related to Plaintiff's Iranian heritage.   From the
outset, the ALJ's statements appeared to indicate that he did not

24

find Plaintiff to be trustworthy and that he had somewhat negative opinion of individuals from the country of Iran. Examples of this are the following:

- When discussing Plaintiff's smoking habits on the record, the ALJ remarked, "**People in Iran**, they smoke a lot . . . A lot of smokers." (AR 72-73) (emphasis added).

- The ALJ implied that because Plaintiff was Iranian, Plaintiff hoped to retire early, which is why Plaintiff brought the claim:

  [ALJ]:      **And [Iranian] culture provides that people normally retire at what, 50/55?** (emphasis added).

  [Plaintiff]:   I don't know Your Honor.

  [ALJ]:   You don't?  Okay.

  [Plaintiff]:   No, Your Honor.  I don't know.

  [ALJ]:   Because I'm getting the feeling that you figure at 63 it's time you should be getting your retirement, but you have to keep working.

  [Plaintiff]:   No, Your Honor. (AR 83).

25

- Later, when Plaintiff tried to convince the ALJ that he was an honest, hardworking person, the ALJ responded, **"Don't take anything I'm saying as a condemnation from [sic] your heritage** because I still think . . . You still come across to me as a really nice guy. . . . I'm just not really buying some of it. . . . **And I have no problem with people from Iran or anywhere else in the world frankly**." (AR 85-86) (emphasis added).

- The ALJ observed in open court that Plaintiff would be a successful auto accident appraiser because Plaintiff was "a good talker," and then arbitrarily implied that there were facts that Plaintiff might be trying to conceal from the court:

[ALJ]:    You should do pretty well at [being an auto accident appraiser] because you're a good talker.

[Plaintiff]:    Your Honor, I'm straight honest with you.

[ALJ]:    You like to talk a lot.

[Plaintiff]:    Well, I like to --

[ALJ]:    That's not meant as a criticism, [y]ou're a pleasant guy.

[Plaintiff]:    Thank you.

[ALJ]:    You know, one of these days when you keep talking, especially when you're proceeding

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

like this, you might just say something your
attorney doesn't want you to say.

[Plaintiff]:   I'm sorry.   I'm just talking straight,
whatever, honest.


(AR 40-41).   Later, when Plaintiff misstated the name
of the doctor who would attest to Plaintiff's ability
to sit and stand less than two hours a day, the ALJ
remarked to Plaintiff, "See, there you go.   You might
say something she doesn't want you to say."   (AR 54-
55).

- When Plaintiff disputed that he had told Dr. Askarinam
  that he was still smoking a half pack of cigarettes a
  day, the ALJ interrupted Plaintiff, telling him that
  he "sound[ed] like [he] smoke[ed]."   He then proceeded
  to say, "You know, there's a certain nature or
  character to people, a sound and looks [sic] and so
  forth, who are smokers."   (AR 42-44).

- When Plaintiff attempted to show the ALJ that his hand
  shook a great deal, the ALJ responded, "I can do that
  too," implying that Plaintiff was faking his symptoms.
  Plaintiff then asked, "You think I'm faking it in
  front of you?"   The ALJ responded, "That's one of the
  things I have to figure out.   That's what I'm here
  for."   (AR 48-49).

The ALJ made <u>four</u> direct references to Plaintiff's ethnicity, none of which were necessary to resolve any of issues presented to the ALJ.   Given the direct evidence of comments about Plaintiff's heritage or comments about "people from Iran", the Court finds that this matter should be reassigned to a different ALJ upon remand.

## VIII.

### CONCLUSION

Because the Court remands on the issues described above, it is unnecessary to reach any of Plaintiff's remaining arguments. Consistent with the foregoing, IT IS ORDERED that judgment be entered REVERSING the decision of the Commissioner and REMANDING this matter for further proceedings consistent with this decision. IT IS FURTHER ORDERED that the Clerk of the Court serve copies of this Order and the Judgment on counsel for both parties.

January 13, 2015

                                        /S/
                                 SUZANNE H. SEGAL
                                 UNITED STATES MAGISTRATE JUDGE

**NOTICE – THIS DECISION IS NOT INTENDED FOR PUBLICATION IN WESTLAW, LEXIS OR ANY OTHER ELECTRONIC DATABASE.**